UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE COMMISSION, :
:
               Plaintiff, :
:
               v. :   Civil Action No.:
:   08-cv-5110 (JSR)
JOSEPH A. FONTANETTA and :   ECF CASE
BURR B. McKEEHAN, :
:
             Defendants. :
_____:

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1. This case involves the unlawful tipping of, and trading on the basis of, material nonpublic information concerning the acquisition of Animas Corporation ("Animas") by Johnson & Johnson ("J&J"), which was announced on December 16, 2005. Defendant Joseph A. Fontanetta ("Fontanetta"), who had personal and professional relationships with executive management at Animas, and individuals associated with Animas executives, unlawfully tipped Defendant Burr B. McKeehan ("McKeehan") who then traded in Animas stock in advance of the merger announcement.

2. During a December 14, 2005 telephone call, Fontanetta told McKeehan about the merger, specifically that Animas was going to be sold soon. Only minutes after talking with Fontanetta, McKeehan began purchasing Animas common stock. In total, on December

14 and December 15, 2005, McKeehan purchased 30,000 shares of Animas stock, generating $183,018 in illegal profits.

3.  Prior to the market opening on December 16, 2005, J&J announced that it had entered into a definitive merger agreement whereby it would acquire Animas. On the day of the merger announcement, Animas common stock closed at $24.03, an increase of $5.83, or 32 percent, from the prior day's close of $18.20.

4.  By knowingly or recklessly engaging in the conduct described in this Complaint, McKeehan and Fontanetta violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## JURISDICTION AND VENUE

5.  The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1], to enjoin such acts, practices and courses of business, and to obtain disgorgement, prejudgment interest and civil money penalties.

6.  This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

7.  Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means and instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

**DEFENDANTS**

8.   <u>Joseph A. Fontanetta</u>, age 57, is a resident of Paramus, New Jersey.  He is a member of the Board of Directors and the Chief Executive Officer of Diopsys, Inc. ("Diopsys"), a privately-held company.  Prior to joining Diopsys, Fontanetta worked in various positions at different publicly-traded companies.

9.   <u>Burr B. McKeehan</u>, age 65, is a resident of Monarch Beach, California.  He is a retired podiatrist.  McKeehan was one of the original investors in Animas, when it was formed in 1996 as a privately-held company.  He is also an investor in Diopsys.

**RELEVANT ENTITY**

10.   Animas Corporation was headquartered in West Chester, Pennsylvania, and designed, manufactured and sold products and services for patients with insulin-requiring diabetes.  Animas' common stock was traded on the NASDAQ National Market System until February 2006 when the merger with J&J became effective.

**FACTS**

**Background**

11.   Defendant McKeehan was introduced to Diopsys and its Chief Executive Officer, Defendant Fontanetta, by an Animas executive officer who served on the Diopsys Board of Directors.  McKeehan has known this Animas executive for more than 20 years.

12.   One of the founders of Diopsys ("Founder") is married to another Animas executive officer ("Founder's Wife").  Founder, who still retains a position on the Board of Diopsys, hired Fontanetta at his wife's recommendation.  Fontanetta and Founder's Wife have known each other since the early 1980s when they worked together at a public company.

13. Diopsys is a small, privately-held, medical instrumentation company, and is continually seeking to raise capital. In early 2005, Fontanetta asked McKeehan to invest in Diopsys. McKeehan invested approximately $100,000 in Diopsys, and his son-in-law invested approximately $50,000.

14. In May 2005, shortly after McKeehan invested in Diopsys, Fontanetta, at McKeehan's request, hired McKeehan's daughter as a Diopsys sales associate.

**Timing of Merger Negotiations between J&J and Animas**

15. J&J, through a subsidiary, had for several years invested in Animas. Beginning in December 2003, J&J had expressed interest in acquiring the company. This interest was not seriously considered by Animas, however, until May 2005, when Animas was being pursued by another potential acquirer.

16. Between May 2005 and November 17, 2005, J&J and the other company actively conducted due diligence in furtherance of acquiring Animas.

17. On December 6, 2005, the Animas Board of Directors authorized the company's management to negotiate a definitive merger agreement with J&J. On December 15, 2005, a definitive merger agreement was reached and approved by the Animas Board.

18. On December 15, 2005, the day before the merger announcement, Animas common stock closed at $18.20 per share.

19. On December 16, 2005, prior to the market open, J&J announced that it would acquire Animas for $24.50 per share.

20. Animas stock opened on December 16, 2005 at $24.04, traded as high as $24.25 per share and closed at $24.03, an increase of $5.83, or 32 percent, over the previous day's closing price.

4

**Fontanetta Was Either Tipped By, or Misappropriated Material Nonpublic Information about the Animas Merger From, Founder.**

21.  Defendant Fontanetta had a personal and business relationship with Founder, whose wife was an executive at Animas.

22.  Because of her duties at Animas, Founder's Wife knew about the merger prior to the public announcement. She participated in the due diligence and negotiations, and she owed a duty to Animas and its shareholders to keep the information confidential.

23.  Based on conversations with his wife, Founder knew about the merger negotiations prior to the public announcement. He knew the status and progress of the negotiations, and that J&J was the possible acquirer.

24.  Founder owed a duty of trust and confidence to his wife to maintain the confidentiality of the information she told him about the merger negotiations. Moreover, Founder and Founder's Wife had a mutual understanding that information about the merger negotiations was confidential and had to be maintained as such.

25.  Defendant Fontanetta also had a relationship of trust and confidence with Founder. Fontanetta and Founder have known each other for at least 20 years. Founder and Fontanetta worked closely together at Diopsys, both sitting on the Board of Directors, and talked often about business matters relating to Diopsys. As Chief Executive Officer, Fontanetta reported all matters concerning Diopsys to the Board of Directors. Fontanetta also knew that Founder's Wife was an executive at Animas.

26.  From December 12 through December 14, 2005, Fontanetta was in California on business working with McKeehan's daughter, who was then employed by Diopsys.

27. On December 13, 2005, at 8:11 a.m. Pacific Standard Time ("PST"), just three days before the merger was announced, Founder and Fontanetta spoke by telephone for seven minutes. During that call, Founder was in Westchester County, New York.

28. During the December 13 call, Founder, either in breach of his duty of trust and confidence to Founder's Wife, or with an expectation that Fontanetta would keep the information confidential, told Fontanetta material nonpublic information concerning the Animas merger negotiations.

29. As described below, Fontanetta, knowing the relationship of Founder and Founder's Wife to Animas, and knowing the material nonpublic nature of the information he received, in turn, for his direct or indirect personal benefit, tipped that information to McKeehan.

30. In the evening of December 13, 2005, after Fontanetta's telephone call with Founder, Fontanetta had dinner with McKeehan's daughter and told her that McKeehan would be getting good news about Animas because the company was soon to be sold, and that he should be congratulated on a smart investment.

31. The next day, December 14, 2005, McKeehan's daughter told McKeehan about her conversation with Fontanetta, and McKeehan subsequently called Fontanetta. In that telephone call, Fontanetta told McKeehan about the Animas merger negotiations.

32. Fontanetta knew or was reckless in not knowing that the information about the Animas merger negotiations that he learned from Founder was material and nonpublic, and had been disclosed to him in breach of a fiduciary duty or similar duty of trust and confidence, such that Fontanetta could not purchase or sell Animas securities, or tip others so that they could purchase or sell Animas securities, on the basis of such information.

33. Alternatively, Fontanetta breached a duty of trust and confidence that he owed to Founder, by misappropriating from Founder material nonpublic information about the Animas merger negotiations, and then tipping that information to McKeehan.

**After Being Tipped By Fontanetta, McKeehan Traded on the Basis of Material Nonpublic Information.**

34. As described above, after being told material nonpublic information about the merger by Founder, Fontanetta told McKeehan's daughter that Animas would soon be sold.

35. The next day, December 14, 2005, two days before the merger announcement, McKeehan's daughter called her father at 11:04 a.m., PST, and spoke to him for four minutes, and again at 11:11 a.m. for two minutes.

36. At 11:15 a.m. PST, only two minutes after McKeehan and his daughter ended their conversation, McKeehan called Fontanetta and spoke with him for 13 minutes, until 11:28 a.m. PST. During this telephone call, Fontanetta told McKeehan that Animas was going to be sold soon and that, as a result, McKeehan would be making some money soon.

37. At 11:34 a.m. PST, six minutes later, McKeehan placed a seven minute telephone call to his son, who was a registered representative at Broker-Dealer A, and the broker for all of his father's accounts there. During this call, McKeehan told his son to purchase Animas stock for his account.

38. Shortly thereafter, at 12:00 p.m. PST, McKeehan's son entered McKeehan's order to buy 10,000 shares of Animas stock at $17.70 per share.

39. At 1:35 p.m. PST (4:35 p.m. EST), after the markets were closed, McKeehan made a three minute telephone call to Broker-Dealer B, where he had a brokerage account in the name of the McKeehan Family Trust.

7

40. The following day, as soon as the markets opened, McKeehan purchased 10,000 shares of Animas stock in the McKeehan Family Trust account at an average of $18.14 per share, and an additional 10,000 shares of Animas stock in his account at Broker-Dealer A at $17.95 per share.

41. The total price of McKeehan's purchases of 30,000 shares of Animas stock on December 14 and 15, 2005 was $537,881. These were unusually large trades for McKeehan.

42. Based on the closing price on the day of the merger announcement, $24.03 per share, McKeehan realized potential profits of $183,018 as a result of his purchases of Animas stock on December 14 and 15, 2005.

43. McKeehan's purchases were in direct contrast to his trading pattern in the weeks leading up to the merger announcement. Less than 30 minutes prior to the December 14, 2005 purchase made by McKeehan after his telephone call with Fontanetta, and for weeks prior, McKeehan had been consistently selling Animas stock that he then owned.

44. In fact, between November 17 and December 14, 2005, McKeehan sold a total of 27,000 shares of Animas stock at an average price of $17.19 per share.

45. As part of these sales, on December 14, 2005 at 11:08 a.m. PST, only 26 minutes prior to McKeehan's telephone conversation with his son at 11:34 a.m., his son, at McKeehan's direction, had entered an order to sell 2,000 shares of Animas stock in his father's account.

46. Between November 17 and December 14, 2005, McKeehan did not purchase any shares of Animas stock until minutes after his December 14 call with Fontanetta, when he bought back more shares than he had recently sold.

47. McKeehan knew or was reckless in not knowing that the information about the Animas merger that he learned from Fontanetta was material and nonpublic, and had been

8

disclosed to him in breach of a fiduciary duty or similar duty of trust and confidence, such that McKeehan could not purchase or sell Animas securities on the basis of such information.

48.  At some time after the merger announcement on December 16, 2005, and during the investigation conducted by Commission staff, McKeehan suggested to Fontanetta in a telephone conversation that they should conceal the fact that they had spoken about the sale of Animas.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

49.  The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 48, inclusive, as if they were fully set forth herein.

50.  Defendants Fontanetta and McKeehan, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

51. By engaging in the foregoing conduct, Defendants Fontanetta and McKeehan violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

**WHEREFORE**, the Commission respectfully requests that this Court:

**I.**

Permanently restrain and enjoin Defendants McKeehan and Fontanetta from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder;

**II.**

Order Defendant McKeehan to disgorge his unlawful trading profits derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Order Defendants McKeehan and Fontanetta to each pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**IV.**

Grant such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

_____s/_____
Daniel M. Hawke
Elaine C. Greenberg
David S. Horowitz
Amy J. Greer
Tami S. Stark  (TS-8321)
Deborah E. Siegel
Nuriye C. Uygur
Jennifer L. Crawford

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: June 4, 2008